The STATE ex rel. DAYTON NEWSPAPERS et al.

v.

DAYTON BOARD OF EDUCATION et al.

[Cite as *State ex rel. Dayton Newspapers v. Dayton Bd. of Edn.* (2000), 140 Ohio App.3d 243.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 18247.

Decided July 20, 2000.

244

---

*Robert P. Bartlett, Jr.* and *Janice M. Paulus,* for relator Dayton Newspapers, Inc.

*Nicholas E. Subashi* and *Steven L. DeVita,* Dayton Public Schools Legal Department, for respondent Dayton Board of Education.

*Robert E. Portune* and *Ron Kozar,* for intervening relator WHIO–TV–7.

*Schroeder, Maundrell, Barbiere & Powers and John W. Hust,* for respondent Hazard, Young, Attea & Assoc., Ltd.

---

*Per Curiam.*

This matter is before the court on an alternative writ of mandamus filed on April 12, 2000. The alternative writ ordered respondents, Dayton Board of Education (the "board") and Hazard, Young, Attea & Associates ("Hazard"), to show cause in writing why a writ of mandamus requested by petitioner, Dayton Newspapers, Inc. ("DNI"), should not be granted.

The board filed a response to the alternative writ on April 17, 2000. Therein, the board also moved to dismiss DNI's petition or for summary judgment in the alternative. Hazard has not filed a response.

DNI's petition for writ of mandamus was filed pursuant to the Ohio Public Records Act, R.C. 149.43. It asks us to order the board and Hazard to disclose certain information to which DNI claims it has a right pursuant to the Act. DNI also seeks an award of attorney fees, for which the Act provides. In addition to our alternative writ, the proceedings on DNI's petition have produced two other matters for decision.

First, DNI has moved for a default judgment against Hazard pursuant to Civ.R. 55. Hazard has failed to plead or otherwise respond to DNI's petition. Pursuant to Civ.R. 8(D), that failure operates as an admission. However, we decline to enter judgment against Hazard on the basis of that admission alone, in view of the legal issues presented. The motion for default judgment is therefore denied. Any judgment for or against Hazard on DNI's petition will be entered on the merits.

The second matter presented for our decision is a motion to intervene that was filed pursuant to Civ.R. 24 by WHIO–TV–7, which seeks the same mandamus relief that DNI has requested. We granted WHIO–TV–7's motion to intervene on May 5, 2000. The board subsequently moved to dismiss WHIO–TV–7's petition and/or for summary judgment.

The issues involved in this proceeding arise from steps taken by the board earlier this year to recruit, select, and hire a new school superintendent. The board also appointed an acting superintendent to serve upon the former superintendent's resignation and until a new superintendent is hired. The board also contracted with Hazard, a consulting firm in Illinois, to assist in the search process.

On April 6, 2000, DNI made a written request asking the board to provide DNI copies of all documents in the board's possession that related to its superintendent search, including correspondence and notes. DNI stated that the request was made pursuant to R.C. 149.43 and R.C. 121.22. DNI made a similar request of Hazard, also specifying that it wished to have a copy of each applicant's resume. WHIO–TV–7 made similar requests of the board on April 7, 2000.

The board declined the DNI and WHIO–TV–7 requests, stating that the requested materials constitute "trade secrets" that may not be disclosed without the owner's consent per R.C. 1333.61, and are thus exempt from the requirements of R.C. 149.43. Hazard did not reply.

DNI next commenced this original action seeking a writ of mandamus requiring the board and Hazard to provide the materials that DNI had requested. Our alternative writ then issued. The board has asserted the "trade secrets" defense in response to the alternative writ. The board also argues that both DNI's and WHIO–TV–7's petitions should be dismissed as moot because a new school superintendent has since been hired.

 We do not agree that hiring a superintendent renders the petitions moot. Relators are prosecuting a statutory right to have the information. They may yet wish to have the names and backgrounds of applicants who were not chosen for the job. Further, the board's trade secrets defense presents an important issue that is capable of repetition, yet evading review. Such issues are not subject to dismissal as moot. *State ex rel. Margolius v. Cleveland* (1992), 62 Ohio St.3d 456, 584 N.E.2d 665.

R.C. 149.43 requires any public office, including a school board, to make public records in their possession available for inspection upon request and to make copies of those records available at cost. Subsection (C) authorizes a person whose request is denied to commence a mandamus action to obtain the public records requested. Those materials are defined by subsection (A)(1) of R.C. 149.43 to be any and all records held by a public office except, *inter alia,* "records the release of which is prohibited by state or federal law." The board argues that R.C. 1333.61 *et seq.,* the Ohio Trade Secrets Act, prohibits the release of the records that DNI requested.

 It is well settled that any exceptions to disclosure in R.C. 149.43 are strictly construed against the custodian of public records, and that the burden to establish an exception is on the custodian. *State ex rel. James v. Ohio State Univ.* (1994), 70 Ohio St.3d 168, 637 N.E.2d 911. Further, R.C. 149.43 is liberally construed to further broad access, and any doubt is resolved in favor of disclosure. *State ex rel. The Warren Newspapers, Inc. v. Hutson* (1994), 70 Ohio St.3d 619, 640 N.E.2d 174.

In *State ex rel. The Plain Dealer Publishing Co. v. Cleveland* (1996), 75 Ohio St.3d 31, 661 N.E.2d 187, the court held that resumes of applicants for the position of Cleveland Police Chief are public records subject to disclosure per R.C. 149.43. The court rejected a need-for-privacy claim, pointing out that, in contrast with records of Social Security numbers, "there is no legislative scheme protecting resumes of applicants for public employment * * * , and the city has not established the same high potential for victimization that could result from disclosure of resumes * * * ." *Id.* at 35, 661 N.E.2d at 190–191.

The court arrived at the same result a year later in *State ex rel. Gannett Satellite Info. Network v. Shirey* (1997), 78 Ohio St.3d 400, 678 N.E.2d 557. There, the court held that the names of applicants for the position of Cincinnati Safety Director were subject to disclosure per R.C. 149.43, notwithstanding the fact that the materials requested were in the possession of a private consulting firm that had designated them trade secrets. The court held that R.C. 149.43 cannot be "circumvented by the delegation of a public duty to a third party." *Id.* at 403, 678 N.E.2d at 561. The court went on to state:

"Finally, resumes and supporting documentation provided by the safety-director applicants are not exempt trade secrets. See R.C. 1333.61(D); *State ex rel. Toledo Blade Co. v. Univ. of Toledo Found.* (1992), 65 Ohio St.3d 258, 264, 602 N.E.2d 1159, 1163–1164 ('The protection of competitive advantage in private, not public, business underpins trade secret law.')." *Id.*

Both *Cleveland* and *Shirey* were decided after the effective date of the Ohio Trade Secrets Act, R.C. 1333.61 *et seq.*, upon which the board relies to claim that the materials that DNI has requested are exempt from disclosure. Application of the Trade Secrets Act to the claims before us requires examination of its terms.

R.C. 1333.62 authorizes a court to enjoin *misappropriation* of a trade secret. R.C. 1333.65 authorizes courts to protect trade secrets from misappropriation by ordering records sealed and granting protective orders. R.C. 1333.63 authorizes a recovery of monetary damages for misappropriation.

"Misappropriation" of a trade secret is defined by R.C. 1333.61 to include disclosure of the trade secret of another without his consent when it was acquired by the disclosing party by or as a result of some improper means, mistake, or accident. Subsection (D) of that section states:

" 'Trade secret' means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, address-es, or telephone numbers, that satisfies both of the following:

"(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

"(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

 Materials that are trade secrets are exempt from disclosure under R.C. 149.43 because the Ohio Trade Secrets Act constitutes a law that prohibits release of such records, which are thus exempt from disclosure per subsection (A)(1) of R.C. 149.43. *State ex rel. Besser v. Ohio State University* (2000), 87 Ohio St.3d 535, 721 N.E.2d 1044. Further, governmental entities can have trade secrets. *Id.* Whether any materials are trade secrets should be determined by a court in which a mandamus action is filed after and on the basis of an *in camera* review of the materials. *Id.; State ex rel. The Plain Dealer v. Ohio Dept. of Ins.* (1997), 80 Ohio St.3d 513, 687 N.E.2d 661. If the court finds that the records contain excepted information, this information must be redacted and any remaining information must be released. *State ex rel. Master v. Cleveland* (1996), 75 Ohio St.3d 23, 661 N.E.2d 180.

 The board has submitted the materials in its possession covered by the relators' requests, and we have examined those materials *in camera*. They consist of the names, applications, and resumes of some thirty-eight persons. The information includes their professional background, current position, and current salaries. We find that these materials constitute one of the generic forms of information that may constitute trade secrets per R.C. 1333.61(D). Whether they are, and therefore exempt from disclosure under R.C. 149.43, depends on whether they satisfy the two-prong qualitative test in R.C. 1333.61(D)(1) and (2).

The board's combined response to the alternative writ and its motions to dismiss and for summary judgment are supported by an affidavit of Dr. Sam Mikaelian, a professional educator who assisted the board in its search for a new superintendent. Mikaelian opines, and the board argues, that disclosure of the names and resumes of applicants would put the board at a competitive disadvantage in securing the services of the best candidate for the superintendent's position. He also states that many of the candidates would not have applied without the assurances of confidentiality that were made to them.

In *Besser*, the Ohio State University Hospitals system was considering the purchase of Park Medical Center, a private Columbus hospital. Information covered by an R.C. 149.43 request included asset summaries, a business plan, financial calculations and projections, and transaction status reports. It also included a summary analysis of potentially comparable hospitals.

█ Information in the possession of a public entity is a trade secret if "[i]t derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." R.C. 1333.61(D)(1). Further, the entity's efforts to maintain its secrecy must be "reasonable." R.C. 1333.61(D)(2).

The information requested in *Besser* surely derived independent economic value from not being generally known or readily ascertainable. It would have had value to the private owners of Park Medical Center in negotiating the sale of its assets to the Ohio State University Hospital. It also had potential economic value in not being known to other prospective purchasers as well as the operators of other hospitals in the Columbus area, which could obtain economic value from its disclosure. Further, the keen competition among health care providers made efforts to maintain its secrecy reasonable.

It may be, as the board contends, that disclosure or the potential of disclosure would inhibit some qualified persons from applying for the open position of school superintendent. If so, the board's policy of secrecy would be reasonable. However, that same fact does not demonstrate what independent economic value the requested information has or how other private persons could reap some economic benefit from having it. If those prospects ever did exist, they expired when the board filled the superintendent's position. Finally, the trade secrets law protects competitive advantage in private business, not public business, which is what the board seeks here to protect. *State ex rel. Toledo Blade Co. v. Univ. of Toledo Found.* (1992), 65 Ohio St.3d 258, 602 N.E.2d 1159.

We conclude that the materials in the board's possession or in the possession of Hazard that relators have requested are not trade secrets exempt from disclosure pursuant to R.C. 149.43. Our conclusion is based on the foregoing analysis, and on the fact that similar information has been found subject to disclosure pursuant to R.C. 149.43 even after the Ohio Trade Secrets Act came into effect. *Cleveland, supra; Shirey, supra.* We are also guided by the rule that any doubt must be resolved in favor of disclosure. *Hutson, supra.*

We do not mean to suggest that the board lacked sound reasons for wishing to keep the application process confidential. The Dayton City Schools are beset with problems, as many urban schools are. The best possible leadership is needed to address those problems, but the very best candidates might be dissuaded from applying if their applications may become public. Some do not want his/her employer to know that he/she is looking for other work, lest the employer decide that it's time for him/her to move on. Nevertheless, these issues present policy questions that are not subject to judicial scrutiny. If they are

serious enough to require a specific exemption from the disclosure requirements of R.C. 149.43, that decision must come from the General Assembly.

■ Both DNI and WHIO–TV–7 have requested an award of attorney fees against the board and Hazard. R.C. 149.43 authorizes such awards, to the extent that the petitioner has actually paid such fees. *Besser, supra.*

"The award of attorney fees in a public records case is not automatic. R.C. 149.43(C) allows a court to use its discretion in awarding such fees. *State ex rel. Fox v. Cuyahoga Cty. Hosp. Sys.* (1988), 39 Ohio St.3d 108, 529 N.E.2d 443. In granting or denying attorney fees, the court should consider the reasonableness of the government's failure to comply with the public records request and the degree to which the public will benefit from release of the records in question. *State ex rel. Warren Newspapers, Inc. v. Hutson* (1994), 70 Ohio St.3d 619, 626, 640 N.E.2d 174, 180." *State ex rel. Olander v. French* (1997), 79 Ohio St.3d 176, 179, 680 N.E.2d 962, 964.

The Trade Secrets Act was recently amended so as to cover governmental entities, and the Supreme Court held in *Besser, supra,* that governmental entities can have trade secrets. Attorney fee awards are regarded as punitive. *French, supra.* "Certainly, courts should not be in the practice of punishing parties for taking a rational stance on an unsettled legal issue." *Id.* at 179, 680 N.E.2d at 965. The board's stance here was rational, and the legal issue was not settled. Therefore, the exemption that it claimed was reasonably grounded in the law.

The public may benefit from the release of public records simply "from a satisfaction of the public's right to know." *Id.,* citing *State ex rel. Multimedia, Inc. v. Whalen* (1990), 51 Ohio St.3d 99, 554 N.E.2d 1321. There was a real concern in a large segment of the Dayton public about the appointment of a new superintendent. Publication of the names and backgrounds of applicants could allow those who were interested as citizens to pass on the correctness of the board's ultimate choice. That is the true purpose of the Public Records Act, one that may yet be served even though an appointment has since been made. We do not agree with Judge Young's dissent that publication of the information now amounts to "media voyeurism," though it is unlikely that publication will be comprehensive enough to allow much basis for comparison.

Nevertheless, we conclude that an award of attorney fees is not warranted. The board acted out of good faith when it denied relators' requests. Both relators are large and wealthy corporate entities that can well afford to pay their attorneys to prosecute mandamus actions. We see no good purpose to be served in punishing the board by applying the taxpayers' monies to pay the relators' fees.

Upon the foregoing considerations, the motions filed by the respondent board are overruled and the writ of mandamus for which petitioners DNI and WHIO–TV–7 have petitioned will issue, and respondents are ordered to provide the required disclosure forthwith. So ordered.

*Judgment accordingly.*

GRADY, P.J., and WOLFF, J., concur.

FREDERICK N. YOUNG, J., dissents.

FREDERICK N. YOUNG, Judge, dissenting.

I must respectfully but strongly dissent, although I agree with the legal analysis of the issues addressed by the majority.

In my opinion, the materials sought by the relators no longer exist as public records. These materials are the job applications, including resumes, of individuals responding to a search by the Dayton Board of Education for a new superintendent of its schools.

The public had a legitimate interest in these materials in the process of evaluating all the candidates for a high profile public office.[1] However, once the new superintendent was chosen, the materials sought simply became nonexistent for public evaluation purposes.

Once the board had made its decision, it had two choices with regard to the materials sought here: (1) immediately send them back to the unsuccessful candidates or (2) shred them. Why would the board keep such materials that are no longer of interest to it or, for that matter, to the general public? In any event, we should regard them as constructively shredded and refuse the writ.

Even more important than the fact that there exists no public purpose to release the materials is the generally accepted view, even by the majority here, that such an act would likely cause many of these unsuccessful applicants significant embarrassment or perhaps even outright financial harm.

The issuance of the writ of mandamus "is largely controlled by equitable principles, and the writ may be refused for reasons comparable to those which would have led a court of equity to exercise its discretion in favor of withholding

---

1. Ironically, the Dayton public did not need the materials sought by the relators to decisively influence the board to choose a widely popular local, and the only local, candidate for the new superintendent. A grass roots campaign was mounted for this candidate and succeeded in persuading some members of the board to reverse their votes immediately following a heavily attended meeting where the board was confronted with massive public support for this one local candidate.

its protection of an undoubted legal right." 67 Ohio Jurisprudence 3d (1999) 276, Mandamus, Procedendo, and Prohibition, Section 6. Even this court has recognized that principle. *State ex rel. Beane v. Krebs* (1945), 75 Ohio App. 427, 31 O.O. 247, 43 Ohio Law Abs. 238, 62 N.E.2d 526.

There is no need to wait for the General Assembly to act to protect the job applications of unsuccessful applicants from publication after the job has been filled. After all, "[m]andamus is of ancient origin in the English common law, originating in the courts—not the Legislature." *State ex rel. Burton v. Smith* (1962), 118 Ohio App. 248, 250, 25 O.O.2d 90, 194 N.E.2d 70, 72.

There is great equity in favor of protecting these applicants from the harm that will befall them if the materials are released now, and no equity in favor of the release because there is no genuine public interest now in their release. If the relators were to publish these materials now, it would only be an act of media voyeurism.

The writ should be refused.